IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CRISTIE DORMAN,** | § | CIVIL ACTION NO.: |
| | § | |
| Plaintiff, | § | 4:21-cv-1729 |
| | § | |
| v. | § | |
| | § | **JURY DEMANDED** |
| **WEEKLEY HOMES, LLC,** | § | |
| | § | |
| Defendant. | § | |

_____

**PLAINTIFF'S ORIGINAL COMPLAINT**
_____

**TO THE HONORABLE U.S. DISTRICT COURT JUDGE:**

NOW COMES Plaintiff Cristie Dorman (hereinafter "Plaintiff") in the above-referenced matter, complaining of and about Weekley Homes, LLC (hereinafter "Defendant"), and files this Original Complaint, showing the following to the Court:

**I.   PARTIES**

1. Plaintiff Cristie Dorman is an individual residing in Harris County, Texas. Plaintiff was employed by Defendant, who conducts business in Harris County, Texas. Plaintiff is a citizen of the State of Texas and of the United States.

2. Defendant Weekley Homes, LLC is a limited liability corporation operating out of Houston, Texas. Defendant's headquarters are located at 1111 N. Post Oak Rd., Houston, Texas 77055 and can be served by and through its registered agent, Corporation Service Company dba CSC - Lawyers Incorporating Service Company at 211 E. 7th St., Ste. 620, Austin, Texas 78701-3218.

**II.   JURISDICTION**

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; 42 U.S.C. § 2000e et seq., as amended, and (iii) 42 U.S.C. § 1981 et seq., as amended.

4. The Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because the Defendant and the Plaintiff transacted business within this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred in this district. At all times pertinent to this Complaint, Defendant maintained offices, conducted business, and resided in this district.

### III.    FACTS

6. Plaintiff began working for Defendant on November 1, 2017 as a temporary employee. Plaintiff's temporary assignment began as a Buyer/Planner and had a duration of ten (10) weeks. As part of Plaintiff's employment offer, as long as Plaintiff performed as expected during the temporary assignment, she would be become a permanent employee in the Supply Chain Office. Plaintiff was also assigned and cross-trained as an Executive Assistant as the existing Executive Assistant, Paula Butler (hereinafter "Ms. Butler"), was retiring soon.

7. On December 27, 2017, before the ten (10) week period ended, Plaintiff was hired on a permanent basis due to Plaintiff's outstanding performance. At this time, Plaintiff was granted access to her Supervisor's, Bill Justice (hereinafter "Mr. Justice"), work and personal email accounts. Upon the permanent hiring, Plaintiff was told that she would become Ms. Butler's replacement as Executive Assistant and Senior Buyer/Planner as soon as Ms. Butler retired. Plaintiff was to complete a year of training with Ms. Butler before she retired. During this time, Plaintiff worked alongside Mr. Justice, Ms. Bulter, Austin Fisette (hereinafter "Mr. Fisette"), Lisa Davidson (hereinafter "Ms. Davidson"), Aimee Davis (hereinafter "Ms. Davis"), and Nicole Southerland (hereinafter "Ms. Southerland").

8. During Plaintiff's first month of employment, Plaintiff was often kept later by Mr. Justice. Mr. Justice would make suggestive sexual innuendos towards Plaintiff. Mr. Justice would make comments about how lucky Plaintiff's husband was, how pretty Plaintiff looked, how wonderful of a figure Plaintiff had, and made comments that Plaintiff must have men chasing her all the time.

9. On December 15, 2017, Defendant held a team building exercise in The Woodlands, Texas. Mr. Justice, Mr. Fisette, Ms. Davidson, Ms. Southerland, and Plaintiff were in attendance and the event ended at approximately six in the evening. Mr. Justice drove Plaintiff and Mr. Fisette back to their vehicles once the event was over so that they did not have to walk; Plaintiff was sitting in the passenger seat and Mr. Fisette was sitting in the back seat. Once they arrived at the parking lot where Plaintiff's and Mr. Fisette's vehicles were parked, Plaintiff and Mr. Fisette exited Mr. Justice's vehicle.

10. After Mr. Fisette entered his vehicle, Mr. Justice stopped Plaintiff on her way to her vehicle and asked if she wanted a ride to her vehicle which was only about six (6) to eight (8)

parking spaces down. Plaintiff accepted the offer. However, upon entering the vehicle, thinking it would be a short drive, Mr. Justice took Plaintiff on a tour to see Mr. Justice's church and house. On the drive back to Plaintiff's vehicle, Mr. Justice's divorce attorney, Randy Whilhite, called Mr. Justice. Mr. Justice left the phone conversation on speaker phone where Plaintiff could hear the entire conversation. Plaintiff felt uneasy about being able to hearing the conversation because Plaintiff felt as though she was in the middle of Mr. Justice's personal matters. Since Plaintiff had access to Mr. Justice's personal email account, Plaintiff was privy to Mr. Justice's personal matters. Plaintiff was instructed to read Mr. Justice's personal emails and speak with him about the emails on a daily basis.

11. Around that same time, Plaintiff was asked to go to the Builders Show in Orlando, Florida with Mr. Justice and Ms. Davidson. Plaintiff accepted and attended the Builders Show, which occurred from January 8-12, 2018. During this time, a part of Plaintiff's duties was to guard Mr. Justice's personal items. After they retired to their rooms one evening, Mr. Justice called and asked Plaintiff to meet him in his room so that Plaintiff could bring his pills and phone charger to him.

12. Plaintiff shared this request with Ms. Davidson and she responded that she heard rumors that Mr. Justice was not of good moral character when it comes to women. Ms. Butler had told the same information to Plaintiff during her training sessions with her. For these reasons, Plaintiff asked Ms. Davidson to accompany her to meet Mr. Justice in his room. On their way to Mr. Justice's room, Ms. Davidson told Plaintiff that she had complained about Mr. Justice to Human Resources.

13. The sexual harassment against Plaintiff continued throughout the next few months. Mr. Justice constantly called Plaintiff after work hours and made Plaintiff take care of all his official and personal matters, even though it was not a part of her job duties.

14. Plaintiff was also instructed by Mr. Justice to read and brief him on all his work and personal emails. Often times his personal emails contained information about his wife and their divorce proceedings. In one of the emails Plaintiff read aloud to Mr. Justice was his soon-to-be ex-wife claiming Mr. Justice to be a pedophile, sexual deviant, and liked to pleasure himself with teenage girls. Mr. Justice would continuously show Plaintiff text message exchanges between himself and his wife that included provocative pictures of his wife. Mr. Justice shared every intimate detail of his marriage with Plaintiff.

15. On January 24, 2018, Plaintiff took Mr. Justice to the doctor in her vehicle. During the drive, Mr. Justice spoke again of his personal issues with his wife and made suggestive sexual remarks towards Plaintiff. Mr. Justice made statements that Plaintiff should leave her husband for Mr. Justice. Plaintiff rebuked Mr. Justice.

16. On February 20, 2018 and February 21, 2018, Mr. Justice made Plaintiff work late with him until approximately ten in the evening on both nights. During these nights, Mr. Justice massaged Plaintiff's shoulder, spoke in detail about his relationship with his wife, and commented how pretty Plaintiff was. Mr. Justice would continuously instruct Plaintiff to bend over the desk to "show him things" and would then look at her breasts. Plaintiff kept rebuking Mr. Justice's sexual advances.

17. On March 2, 2018, Mr. Justice told Plaintiff that she was not ready for the Assistant Manager position and that he was going to hire someone else. This was in retaliation for refusing Mr. Justice's sexual advances.

18. On April 23, 2018, Mr. Justice asked Plaintiff to accompany him to a Houston Astros Major League Baseball game that evening after work. Plaintiff accepted. When they arrived at the stadium, Mr. Justice "remembered" that he had given the tickets to his attorney. Mr. Justice wanted to make it up to Plaintiff by taking her to dinner. During dinner, Mr. Justice portrayed them as a couple to the waitstaff by ordering dinner for Plaintiff, placing his left arm behind Plaintiff's neck and shoulder area. Plaintiff instructed Mr. Justice that she was happily married and refused his sexual advances.

19. In late April, Terri Blue (hereinafter "Ms. Blue") was hired as the Assistant Manager in the Supply Chain role. Ms. Blue was employed from April to June 2018. During this time, Mr. Justice stopped all communications with Plaintiff. Moreover, he removed Plaintiff as his Executive Assistant and made Ms. Butler his Executive Assistant.

20. Soon after Ms. Blue was terminated, Plaintiff became Mr. Justice's Executive Assistant again at which time he resumed his sexual harassment. Mr. Justice would continuously call Plaintiff during work, after work, and on weekends.

21. On June 8, 2018, Plaintiff walked into Mr. Justice's office as he was looking at pornography on his computer. Mr. Justice made Plaintiff stay in his office, gave her a massage, told her how pretty she was, that she looked nice in her dress, and kept brushing up against her. These types of sexual harassment incidents kept occurred frequently.

22. On October 27, 2018, Mr. Justice was abruptly asked to sign a settlement agreement and submit his resignation. The following week, Mr. Justice announced his retirement during a staff meeting effective April 2019.

23. On November 6, 2018, Plaintiff finally felt safe to report the sexual harassment she had endured for a year with Mr. Justice. Plaintiff shared all the sexual harassment incidents

with Leslie Shannon (hereinafter "Ms. Shannon"), Executive Assistant to Mr. Johnson, the company's President. Plaintiff explained to Ms. Shannon the treatment Mr. Justice had subjected her to. Ms. Shannon responded that she was sad to hear that this had been occurring and that she was going to make Mr. Johnson aware of the situation. The next day, Ms. Shannon called Plaintiff and told her that everything was going to be okay, that she had spoken to Mr. Johnson via email, and that he was aware of the situation.

24. From October 30, 2018 to mid-November 2018, Plaintiff had numerous follow-up conversations with Ms. Shannon and Ryan Hartzog (hereinafter "Mr. Hartzog") to discuss the circumstances surrounding Mr. Justice's retirement. Ms. Shannon and Mr. Hartzog informed Plaintiff that Mr. Justice was being investigated for stealing millions from the company. They also informed Plaintiff that the company was not going to pursue criminal charges against Mr. Justice because he had made so much money over the last sixteen (16) years. Ms. Shannon and Mr. Hartzog assured Plaintiff that Mr. Johnson was aware of the sexual harassment situation and that he was going to make changes in Plaintiff's department, including assigning Plaintiff a new supervisor.

25. Despite the promises of change, Plaintiff kept being subjected to sexual harassment and a hostile work environment by Mr. Justice in the months leading up to Plaintiff's termination. The added hostility caused Plaintiff to visit the Emergency Room in December 2018 after being diagnosed with a gastric ulcer that was stress induced.

26. On December 17, 2018, Plaintiff complained to her new supervisor, Mr. Schiegg of the hostile work environment and the sexual harassment she had endured from Mr. Justice. Mr. Schiegg was apologetic and assured her that "things were going to change." Plaintiff

informed Mr. Schiegg that she loved the work she did for the company and that she was excited to begin a new chapter in the Supply Chain Office with him.

27. In late December 2018, Plaintiff was asked to meet with Mr. Pierce, Director of Human Resources. Ms. Pierce asked Plaintiff to elaborate on the sexual harassment she had reported to Mr. Schiegg. Plaintiff gave her statements to Ms. Pierce. At the end of the meeting, Ms. Pierce assured Plaintiff that her job was not in jeopardy and that the company was trying to figure out a way to terminate Mr. Justice's employment contract immediately.

28. Despite all management promises, on January 14, 2019, Mr. Schiegg and Ms. Pierce terminated Plaintiff's employment.

## V. CLAIMS

### CLAIM 1 – TITLE VII DISCRIMINATION

29. Plaintiff reasserts and incorporate by reference all the above numbered paragraphs.

30. Defendant intentionally engaged in unlawful employment practices against Plaintiff because of her gender (i.e. female), including discrimination and retaliation.

31. Plaintiff was subjected to adverse employment actions, namely, discriminated against in connection with the compensation, terms, conditions, and privileges of employment, as well as limited, segregated, or classified in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status on the account of Plaintiff's sex (i.e. female), in violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

32. Male employees of Defendant were treated more favorably and were not subjected to disparate treatment in the same or similar circumstances.

### CLAIM 2 – TCHRA DISCRIMINATION

33. Plaintiff reasserts and incorporate by reference all the above numbered

paragraphs.

34. Defendant intentionally engaged in unlawful employment practices involving Plaintiff because of her gender (i.e. female).

35. Defendant discriminated against Plaintiff in connection with the compensation, terms, conditions, and privileges of employment; or limited, segregated, or classified Plaintiff in a manner that would deprive or tend to deprive Plaintiff of any employment opportunity or adversely affect her status because of Plaintiff's sex (i.e. female), in violation of the Texas Labor Code § 21.051.

### THIRD CAUSE OF ACTION – TITLE VII RETALIATION

36. Plaintiff reasserts and incorporate by reference all the above numbered paragraphs.

37. Plaintiff engaged in activities protected by applicable federal and state law, namely, reported discrimination and sexual harassment at the hands of Defendant on the basis of her gender.

38. Plaintiff asserts she made a complaint about disparate treatment, yet Defendant failed to conduct a thorough investigation. This complaint should be construed as protected activity under Title VII. Defendant's action were a direct response to cover up their discriminatory animus.

39. The close timing between the protected activity and the adverse action against Plaintiff creates a causal connection between the two.

40. Defendant intentionally retaliated against Plaintiff because of her opposition to Defendant's discriminatory practices and the complaint of sexual harassment that Plaintiff made to Defendant, which was a violation of Title VII. As a result of Defendant's retaliation, Plaintiff

suffered damages (in an amount that is within the jurisdictional limits of this Court).

## FOURTH CAUSE OF ACTION – TCHRA RETALIATION

41. Plaintiff reasserts and incorporate by reference all the above numbered paragraphs.

42. Defendant intentionally retaliated against Plaintiff because of her opposition to Defendant's discriminatory practices and the complaint of sexual harassment that Plaintiff made to Defendant, which was a violation of the Texas Labor Code § 21.055. As a result of Defendant's retaliation, Plaintiff suffered damages (in an amount that is within the jurisdictional limits of this Court).

## VI.   JURY DEMAND

43. Plaintiff demands a jury on all issues to be tried in this matter. As such, Plaintiff submits a jury demand and herein submits the jury fee.

## VII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendant be cited to appear, and answer herein, and that on final trial, Plaintiff has a judgment against Defendant for the following:

   a. All damages that Plaintiff may be entitled to pursuant to this Original Complaint, or any amendments thereto, including (but not limited to) back pay, future wages, reinstatement, upgrading, and compensation for benefits not received;
   b. Compensatory damages, including (but not limited to) emotional distress;
   c. Past, present, and future physical pain and mental suffering;
   d. Punitive damages;
   e. Liquidated damages;
   f. Reasonable attorneys' fees, as allowed by law (with conditional awards in the event of appeal);

      g.      Pre-judgment interest (at the highest rate permitted by law);

      h.      Post-judgment interest from the judgment until paid (at the highest rate permitted by law);

      i.      Costs of Court; and

      j.      Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any proper amendments thereto.

Respectfully Submitted,



_____

Alfonso Kennard Jr.
Texas Bar No.: 24036888
Southern District No.: 713316
alfonso.kennard@kennardlaw.com
Wyatt Holtsclaw

>Texas Bar No.: 24120898
>Southern District No.: 3655964
>Wyatt.Holtsclaw@kennardlaw.com
>5120 Woodway Dr., Suite 10010
>Houston Texas 77056
>(713) 742 -0900 (main)
>(713) 742 -0951 (facsimile)
>**ATTORNEYS-IN-CHARGE FOR PLAINTIFF**